UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HENRY DON WILLIAMS,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>PEOPLE OF THE STATE OF CALIFORNIA,<br><br>　　　　Respondent. | No. 2:17-cv-2627 TLN AC P<br><br>FINDINGS AND RECOMMENDATIONS |

　　　　Petitioner is a California state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action proceeds on the first amended petition, ECF No. 3, which challenges petitioner's 2010 conviction for first-degree murder. Respondent has answered, ECF No. 29, and petitioner filed a traverse, ECF No. 35.

## BACKGROUND

### I.　Proceedings in the Trial Court

#### A.　Preliminary Proceedings

　　　　Petitioner was charged with murder in Solano County, and pled not guilty. No pretrial proceedings are at issue in habeas.

////

////

1

B. <u>The Evidence Presented at Trial</u>

Evidence of the following facts was presented to the jury.[1] Petitioner bought cocaine and methamphetamine from a friend, Ryan Estes, and introduced Estes to another friend, Gene Combs, who also purchased methamphetamine from Estes. Around 3:00 p.m. on Labor Day, 2008, Combs called Estes and asked to buy $50 worth of methamphetamine. The men met at a restaurant, where Combs gave Estes $50 and Estes agreed to meet Combs with the methamphetamine in about an hour. Instead, Estes bought beer with the money and spent about two hours drinking in his garage with some friends. Petitioner eventually arrived, had a beer, and then left.

Combs called Estes around 5:00 p.m., asking about the methamphetamine. Estes told him to wait a few hours. During the course of the evening, Estes received about 15 angry phone messages from Combs, including one in which Combs threatened to burn down his mother's house. Later, there was a voicemail message saying, "Those bullets were meant for you." Estes could not tell if the message was from Combs or not; "it could have been [petitioner] or Combs." District Attorney Investigator Kurtis Caldwell testified that when he interviewed Combs, he admitted leaving Estes the "bullets were meant for you" message.

The same day, petitioner and Nicole Stewart went to a barbeque in Berkeley at the home of Armail Porter. Petitioner showed Porter a box containing a semiautomatic handgun. After petitioner and Stewart left, they drove to see Estes in Fairfield. Petitioner spoke with Estes, then returned to the car where Stewart was waiting.

Petitioner and Stewart then drove to a Popeye's restaurant in Suisun. While the couple was in their car, Combs arrived and got in the backseat. Petitioner told Stewart that Combs "had to get . . . his money back from [Estes]." Combs "was upset because [Estes] had taken his money without giving him whatever he had asked . . . ." Both men were agitated, and a decision was made "that we were going up there [to Estes's house] to get the money." With Stewart driving, the trio left for Estes's house, about six miles away on Silverado, in Fairfield.

---

[1] This summary is adapted from the opinion of the California Court of Appeal, ECF No. 29-1 at 7-8, which the undersigned finds to be accurate.

When they arrived at Estes's house, petitioner went to the door carrying a black case while Combs remained in the backseat. Petitioner spoke with someone at the house, then returned and reported Estes was not there. Stewart made a U-turn and drove away, back down Silverado. Petitioner then told her to pull over, which she did. Petitioner got out of the car and walked behind it, while Combs stayed in the backseat. Shortly thereafter, Stewart heard three gunshots. Combs told her to start the car, and petitioner got into the passenger seat holding his shirt, saying "Go." He told Stewart to take him to his mother's house in Fairfield, then take Combs back to his car near Popeye's, and then return to his mother's home.

While Stewart was driving Combs to his car, she asked "if [petitioner] had shot somebody." Combs told her "[n]ot to worry about it. Just drive." After dropping him off, Stewart returned and found petitioner at the home of Francisco Perez, who lived next door to petitioner's mother. Petitioner and Stewart left after "[n]ot very long," and Stewart drove them to their apartment. Stewart did not ask petitioner any questions about what happened because she was scared.

Bobby Lee White, one of petitioner's neighbors, testified that petitioner arrived at his apartment around 9:00 p.m. that night and told him "'I had to unload my clip on someone.'" Petitioner appeared to be drunk. About half an hour later, petitioner asked White if he had told anyone what he had said.

Petitioner spent the night at the apartment, and he left the next day. He did not tell Stewart where he was going, but she suspected he had gone to Las Vegas. He had previously purchased tickets to Las Vegas which were on his desk, and they were gone.

Petitioner claimed he was only helping Combs collect a debt that evening. Combs had not mentioned "anything about a dope deal" with Estes, and he did not know Combs was planning to shoot him. In fact, he did not know Combs had a gun. According to petitioner, it was Combs who exited the car on Silverado after they left Estes's house. He heard shots, and Combs got back in the car and "said . . . to drive." Combs also gave him the gun. When they reached Perez's house, petitioner went inside, and Combs and Stewart drove away. Petitioner told Perez to "hold on to" the gun, which was wrapped in defendant's shirt. Later, he told Perez to "throw

3

the gun in the water." When Stewart returned, she and petitioner went back to their apartment. He then saw Bobby Lee White, a neighbor, and told him "I'm about to go bad on my mechanic . . . [b]ecause he just jumped out of my car and just unloaded a clip on somebody." Petitioner referred to Combs as his mechanic.

The next day, petitioner received a phone call from Estes and went to Berkeley and stayed with Porter for a night. Porter later told a Fairfield police officer in a recorded statement petitioner told him "'I fucked around and I shot the councilman.'"

The following day, petitioner took a bus to North Carolina, where he stayed for about 12 days. He returned to the San Francisco Bay Area because he heard the police had been at his mother's house. He stayed one day, and then went to Las Vegas because he "was just upset about the whole thing." Petitioner was arrested in Las Vegas on September 20, where he was representing himself as a displaced hurricane victim from Houston named Shiferaw Kollasie.

    C.  Outcome

The jury found petitioner guilty of first degree murder, and also found true the allegation that he had personally and intentionally discharged a firearm in committing the offense. Cal. Penal Code §§ 187(a), 12022.53(d). On August 30, 2010, he trial court sentenced petitioner to state prison for 50 years to life.

    II.    Post-Conviction Proceedings

    A.  Direct Review

Petitioner appealed his conviction to the California Court of Appeal, First Appellate District, which affirmed the judgment on September 27, 2013. ECF No. 29-12 at 99-120. Petitioner then petitioned for review in the California Supreme Court, and review was denied on December 18, 2013. ECF No. 29-15. Petitioner did not petition the United States Supreme Court for certiorari. ECF No. 3 at 3.

    B.  State Collateral Review

On December 3, 2012, petitioner, proceeding through counsel, filed a petition for writ of habeas corpus in the California Court of Appeal, First Appellate District. ECF No. 29-13. On October 16, 2013, the court of appeal issued an order to show cause returnable before the Solano

1  County Superior Court on the issue of juror misconduct.[2]  ECF No. 3 at 56-57.  The trial court
2  held an evidentiary hearing and denied the petition on January 16, 2015.  ECF No. 29-10 at 129.
3  Petitioner then filed an amended habeas petition in the Court of Appeal, addressing the
4  evidentiary proceedings below.  ECF No. 29-16.  The petition was denied on April 12, 2016.
5  ECF No. 3 at 59 (order); ECF No. 29-16 at 254 (docket sheet).  On June 14, 2016, the claims
6  were submitted to the California Supreme Court; that petition was denied on October 12, 2016.
7  ECF No. 29-17.

8  On April 17, 2018, during the pendency of this federal case, petitioner filed a pro se
9  petition for writ of habeas corpus in the California State Court.  ECF No. 29-18.  The petition was
10 denied on August 8, 2018.  Id. at 2; ECF No. 11 at 1.

11 C.  Federal Petition

12 The initial petition in this case was received by the court on December 15, 2017.  ECF No.
13 1.  On January 17, 2018, petitioner proceeded to file an amended petition that asserted two
14 different grounds for relief.  ECF No. 3.  Petitioner was advised that if he wanted to pursue the
15 claims in both the original and amended petitions, then he would need to file an amended petition
16 that included all of the claims and that if he did not, the case would proceed on the amended
17 petition without considering the claim in the original petition.  ECF No. 12 at 2.  Because
18 petitioner did not file a second amended petition, the case proceeded on the first amended
19 petition.  ECF No. 22 at 3-4.

20 After the operative petition was fully briefed, petitioner filed a separate pro se petition in
21 this court challenging the same conviction.  ECF No. 43.  That petition was initially docketed as a
22 new action: Williams v. Johnson (Williams II), No. 2:21-cv-2148 KJM EFB.  The judge in
23 Williams II construed the petition as a motion to amend the petition in this action, and ordered it
24 filed in this case.  Williams II, ECF No. 6.  The motion to amend was denied on the
25 recommendation of the undersigned, on grounds that all newly presented claims were barred by
26 ////

27
28 [2] That claim is presented to this court as Claim One of the operative federal petition.

the statute of limitations.  ECF No. 45 (Findings and Recommendations); ECF No. 47 (order denying motion to amend).

## STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99 (2011).  State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. at 181-182. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182. Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. Richter, 562 U.S. at 102.

## DISCUSSION

I. Claim One: Juror Misconduct

    A. Petitioner's Allegations and Pertinent State Court Record

        1. Allegations of the Petition

The petition alleges that a sitting juror contacted petitioner's wife, Jerilyn Lewis,[3] during the trial and "attempt[ed] to persuade her to have sex with him in exchange for a not guilty verdict." ECF No. 3 at 7. During deliberations this juror, Juror 7, initially supported petitioner's innocence. The jury was initially deadlocked, but ultimately returned a guilty verdict. Id.

In a supporting declaration dated September 5, 2012,[4] Lewis stated that a male juror approached her during a morning break in the trial and that the two spoke. The juror was "friendly,"

---
[3] At the time of petitioner's trial, Lewis was his girlfriend.
[4] This declaration came almost two years following judgment and sentencing.

7

asked her name, and complimented her appearance. He asked why she was at the trial, and she said she was "a friend of the defendant." The juror said, "it'll be okay," reassuring her that he knew the defendant was innocent. The juror hugged Lewis and held her hand, walked with her to the break room, and whispered in her ear that she should meet him during the lunch break. She met him at the lunch break by a concession stand, where he told her he was excited to be part of a high-profile trial and enjoyed the attention and power. He invited her to meet him at the end of the day for coffee. When they met again at the end of the day, the juror looked worried and told her he had been questioned by the judge about his contact with her. He told Lewis that if she wanted him to vote not guilty, she would have to "give [him] some ass." She said she wasn't that kind of person and started to walk away. The juror grabbed her wrist and "forcefully" said if she didn't want her boyfriend to get convicted, she should "agree to have sex with him" before deliberations started. She agreed in order to get away from him. After that the juror would approach her weekly in the parking lot, press against her, and say she should make her decision to have sex with him soon because time was running out. She did not tell anyone about what had happened because she didn't think she would be believed. ECF No. 3 at 38-42.

### 2. Pertinent Portions of the Trial Record

On May 12, 2010, during petitioner's trial, the prosecutor informed the court that family members of the victim had reported seeing "the defendant's wife or girlfriend" with Juror Number 7, "to the extent of hugging, holding hands and accompanying him down to the jury room." ECF No. 29-10 (Misc. Reporter's Transcript) at 6.[5] Juror Number 7 was questioned by both the trial court and the prosecutor in a closed hearing. He explained that while he was on a break, a "lady" who was sitting in the hallway told him that "she was a friend of the defendant's, and that's all she said." Id. at 8. There was no further conversation; she told him she was there "anonymously and that was it." Id. The juror denied having any physical contact with the woman. Id. After questioning, Juror Number 7 assured the court of his ability to be fair in the

////

---

[5] All page numbers used in citation to the lodged state court record are those imposed by the court's electronic filing system.

case. Id. at 9-10. There were no allegations of misconduct involving sexual harassment or an attempt to obtain sexual favors in exchange for a hung jury.

### 3. The State Habeas Evidentiary Hearing

On October 16, 2013, in state habeas proceedings, the California Court of Appeal issued an order to show cause on this claim, returnable before the Solano County Superior Court. An evidentiary hearing was held in superior court on January 16, 2015, following several delays.[6] At the hearing, Ms. Lewis invoked her Fifth Amendment right to remain silent and refused to testify. ECF No. 29-10 (Misc. Reporter's Transcript) at 37-39. In response, the prosecutor offered Lewis immunity for her testimony; her attorney stated that a grant of immunity would not change Lewis's position. Id. at 40, 45. The trial court denied petitioner's request to admit Lewis's declaration as evidence at the hearing, ruling that it was hearsay with no applicable exception. Id. at 47.

Fairfield Police Officer Mark Apley testified that during petitioner's trial the victim's aunt notified him she had seen one of the jurors have contact with "a woman," and that the two had a brief conversation. The officer notified the prosecutor, and a closed hearing on the matter ensued; it was elicited at the hearing that the woman was Jerilyn Lewis. Officer Apley had no personal knowledge regarding any juror misconduct or contact between Ms. Lewis and any jurors. Id. at 49-56.

The victim's mother, Teresa Courtemanche, testified that at petitioner's trial she saw a juror talking with a woman associated with petitioner. Id. at 59-60, 64-65. Ms. Courtemanche expressly denied telling the prosecutor "that this juror was hugging and holding hands with the female[.]" Id. at 64. The victim's father, Raymond Courtemanche, appeared not to remember

---

[6] The evidentiary hearing was initially delayed by Ms. Lewis's failure to appear on two occasions. ECF No. 29-10 (Misc. Reporter's Transcript) at 12, 14. She was eventually arrested to ensure her appearance, see id. at 16 (ordering issuance of bench warrant on September 19, 2013, at defense request), and then released on her own recognizance on October 1 when the hearing did not go forward on that date for other reasons, id. at 28. The October 1 continuance ensued when the public defender representing petitioner declared a conflict and asked to be relieved, and because the court found it appropriate to appoint counsel to represent Ms. Lewis and to give that counsel time to prepare. Id. at 24-30.

clearly whether he had personally observed the reported interaction between Ms. Lewis and the juror or merely learned about if from his wife. See id. at 67-69, 70-72 (denying personal observation, then endorsing statements to investigator about such observation).

Mr. Courtemanche testified that on October 24, 2014, when he was at the courthouse for a previous hearing in the habeas matter, Jerilyn Lewis had approached him in the hallway. Id. at 80. She put out her hand to him, and said something like, "Oh, Mr. Courtemanche, it's time for the truth to come out. No more lies." Id. at 84. She then told him that she was fearful for her own well-being "because of the content of what put her into the position where she filed this—the lie that she called it." Id. Ms. Lewis asked the Courtemanches to pray for her, and the conversation "concluded with her leading us in holding hands and saying a prayer in the hallway[.]" Id.

Investigator Ted Jones testified that when he met with Raymond Courtemanche in November 2014, Mr. Courtemanche relayed to him the conversation he had had with Jerilyn Lewis on October 24, 2014. Id. at 101-104. In addition, Teresa Courtemanche relayed to Jones that Lewis had approached her and told her she was "so sorry, that it's time for the truth to come out[.]" Id. at 104.

Juror Number 7 testified that during petitioner's trial, when he stopped in the hallway to tie his shoe, he noticed a woman crying. She told him that "she was a friend of the defendant and she was there anonymously." Id. at 109, 112-113. The encounter lasted less than a minute. Id. at 109. The only time he saw the woman after that was in passing in the hallway; aside from greetings, the juror did not have "any further conversation with her," including any discussions of a sexual nature. Id. at 109-111. Nor did he have any physical contact with the woman. Id. at 110. They did not discuss the case. Id. at 111.

### B. The Clearly Established Federal Law

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Down, 366 U.S. 717, 722 (1961). In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial.

Remmer v. United States, 347 U.S. 227, 229 (1954). This presumption is not conclusive, however. The burden is on the government to establish that contact with the juror was harmless to the defendant. Id. at 229. "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Smith v. Phillips, 455 U.S. 209, 217 (1982).

   C. The State Court Rulings

    1. The Superior Court's Ruling at the Evidentiary Hearing

  The court ruled from the bench at the conclusion of the evidentiary hearing, implying both that the allegation of juror misconduct was unproved and that it was not credible. ECF No. 29-10 at 126-129. The subsequently issued written opinion stated in full:

> On January 16, 2015, the trial court having conducted an evidentiary hearing to resolve the disputed issues of fact on the Order to Show Cause, the Court finds no juror misconduct.
>
> The petition for writ of habeas corpus is DENIED.

ECF No. 3 at 4.

    2. The California Supreme Court's Denial of the Claim

  The California Supreme Court subsequently denied the claim without comment or citation. ECF No. 29-17 at 2.

    3. Determining Which State Court Ruling is Subject to AEDPA Review

  The first question this court must answer is which state court decision is the subject of review under § 2254(d). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); see also Gill v. Ayers, 342 F.3d 911, 917 n. 5 (9th Cir. 2003) (explaining that federal courts "look through" unexplained rulings of higher state courts to the last reasoned decision). Courts in the Ninth Circuit have long applied the so-called "look through" presumption to California state habeas decisions. See e.g., Gill, 342 F.3d at 917 n. 5; Bonner v. Carey, 425 F.3d 1145, 1148 n.13 (9th Cir. 2005). However, in the context of the look-through doctrine as it applies to California habeas decisions, the Supreme

1 Court has emphasized that "the California courts or Legislature can alter the State's practices or elaborate more fully on their import." See Harrington, 562 U.S. at 100.

In 2020, the California Supreme Court clarified that its summary denial of an original habeas petition does *not* reflect implicit adoption of the prior reasoned decision of a lower court that previously rejected the same claim. Robinson v. Lewis, 9 Cal.5th 883 (2020).[7] In Robinson, the California Supreme Court emphasized the difference between post-conviction review, in which "[a]ll courts in California have original habeas corpus jurisdiction[,]" and direct appellate review. Robinson, 9 Cal.5th at 895. Notably, "a new petition for writ of habeas corpus differs from an appeal in important respects. The new petition can add to or attempt to bolster the claims made in the earlier [habeas] petition." Robinson, 9 Cal.5th at 895. Moreover, "[i]f a lower [state] court has made factual findings following an evidentiary hearing [on a habeas corpus petition], the higher court will give those findings great weight, but it is not bound by them. Thus, a Court of Appeal that considers a new [habeas] petition does not directly review the superior court's ruling but makes its own ruling." Robinson, 9 Cal.5th at 896 (internal citation omitted).[8]

---

[7] In Robinson, the state court was answering a question certified to it by the Ninth Circuit regarding state habeas timeliness rules and so-called "gap delays" between petitions filed in the various state courts.

[8] The only published decision of the Ninth Circuit to have considered the impact of Robinson on application of the "look through" presumption is Flemming v. Matteson, 26 F.4th 1136 (9th Cir. 2022), which held inter alia that the presumption did still apply under the circumstances of the case. Flemming's facts and procedural posture are readily distinguishable from those of the instant case. The issue before the Ninth Circuit in Flemming was the timeliness of the federal petition, which in the final analysis turned on whether the initial superior court petition had been untimely and thus failed to toll the federal statute of limitations. In this context, the Ninth Circuit concluded that later silent denials by higher state courts had not overruled or rejected the superior court's untimeliness finding. It therefore "looked through" silent rejections of petitioner's claims in the state appellate court to a reasoned decision of the superior court finding the claims untimely, finding this result consistent with Robinson. Id. at 1143. Robinson does indeed support that conclusion, because it establishes that each state court is making its own timeliness decision as to the claims before it.

Flemming is inapposite here. Although Robinson itself involved the independent evaluation of timeliness by various state courts, its general explanation of state habeas procedure and the significance of California's unique "original jurisdiction" model of state habeas was not limited to timeliness but applies equally to merits determinations. Indeed, the state court reframed the timeliness question that had been certified to it by the Ninth Circuit because the Ninth Circuit had "assumed that a habeas corpus petition filed in a higher court constitutes a (continued…)

In light of Robinson, the undersigned will evaluate the summary denial of the California Supreme Court under § 2254(d), asking whether there is any reasonable basis for the state court's rejection of the claim. See Richter, 562 U.S. at 102. For the reasons explained below, the analysis would not be materially different if the superior court's decision was the subject of review under § 2254(d).

### D. Objective Reasonableness Under § 2254(d)

It would have been perfectly reasonable for the California Supreme Court to summarily reject petitioner's juror misconduct claim as insufficiently supported by reliable evidence. Although witnesses observed a single brief and innocuous interaction between Juror Number 7 and Ms. Lewis during the trial, the only evidence that Juror Number 7 committed affirmative misconduct—by offering his vote for acquittal in exchange for sex—was the 2012 declaration of Ms. Lewis. That declaration was excluded from evidence as hearsay at the habeas evidentiary hearing,[9] and Ms. Lewis did not testify. Juror Number 7 denied the allegations under oath, and the superior court implicitly found him credible. There were no third-party percipient witnesses to any of the alleged acts of sexual harassment. Accordingly, there was no admissible evidence of misconduct before the state court.

To the extent if any that clearly established federal law gave rise to a presumption of prejudice under Remmer, 347 U.S. at 229, the government met its burden in state court to establish that the hallway contact between Juror Number 7 and Ms. Lewis was harmless to petitioner. The juror's own testimony, both during the trial and at the habeas hearing, was

---

challenge to the lower court's denial of a previous petition." Robinson, 9 Cal.5th at 895. This assumption is incorrect, as the state court expressly stated. It is the same assumption that underlies federal courts' application of the "look through" presumption to successive merits determinations in state habeas. Accordingly, Robinson undercuts the predicate for application of the "look through" presumption to decisions in California habeas cases.

[9] The California Supreme Court could reasonably have adopted that ruling and considered the declaration excluded from the evidence of record. Alternatively, the court could reasonably have made an independent decision to disregard the declaration as not credible in light of the record as a whole, including the failure of Ms. Lewis or petitioner to contemporaneously alert the trial court to the juror's alleged propositioning of Lewis, the two year delay in presenting those allegations, Lewis's decision not to subject herself to cross-examination at the evidentiary hearing, and the complete absence of corroborating evidence.

sufficient to support a factual finding that the contact had been brief and inconsequential, and that it had not affected the juror's performance of his duty. No competent evidence to the contrary was presented. Accordingly, there can have been no unreasonable application of Remmer and progeny.

On this record, rejection of the claim as unsubstantiated would have been entirely reasonable. Petitioner has not identified any way in which the rejection of his claim is objectively unreasonable in light of clearly established federal law, 28 U.S.C. § 2254(d)(1), and the undersigned finds none.

Respondent argues that the superior court's factual finding of no juror misconduct is entitled to a presumption of correctness under 28 U.S.C. § 2254(e). Under that section of the habeas statute, it is petitioner's burden to rebut the presumption by clear and convincing evidence. See Lambert v. Blodgett, 393 F.3d 943, 976 (9th Cir. 2004). Credibility findings after an evidentiary hearing are particularly insulated, because federal habeas courts have "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." Marshall v. Lonberger, 459 U.S. 422, 433-434 (1983); Anderson v. Bessemer City, 470 U.S. 564, 575 (1985) ("only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said"); see also Sophanthavong v. Palmateer, 378 F.3d 859, 867 (9th Cir. 2004).

To the extent that the California Supreme Court may have adopted the factual finding of the superior court that there had been no act of misconduct, or that it may have based its decision on an independent factual determination, the undersigned agrees with respondent that the presumption of correctness applies. In his traverse, petitioner argues that the trial court's ruling is not binding on this court because it was based on Ms. Lewis's failure to come forward, which was the result of intimidation by prosecutor. ECF No. 35 at 2. The undersigned therefore considers whether the witness intimidation allegations of petitioner's Claim Two, which are detailed in the following section of these Findings and Recommendations, are sufficient to overcome the presumption of correctness. In Claim Two, petitioner alleges that the prosecutor deliberately intimidated Ms. Lewis to prevent her from testifying at the evidentiary hearing. Those allegations

and petitioner's related exhibits were presented to the California Supreme Court in an apparent attempt to demonstrate that the superior court's factual determination was incorrect and/or that the failure of proof as to Ms. Lewis's allegations should not count against petitioner.

To the extent that petitioner argues Ms. Lewis was intimidated by her arrest and detention after she twice failed to appear to testify as ordered, the argument fails because issuance of an arrest warrant was independently justified by the witness's repeated failure to appear voluntarily. Moreover, Ms. Lewis was *petitioner's witness*, and the bench warrant was issued at his counsel's request. The use of necessary legal process to secure Lewis's testimony served petitioner's interests, and does not support an inference that she was dissuaded from testifying . To the extent that the subsequent appointment of counsel to represent Ms. Lewis resulted in her assertion of the Fifth Amendment privilege, her refusal to testify was an assertion of her own rights against compelled self-incrimination and does not support any inference that she was being pressured not to testify truthfully in petitioner's favor. Finally, to the extent that petitioner relies on the declarations of third parties to corroborate his assertion that local law enforcement joined a campaign to harass and intimidate Ms. Lewis, the declarants lack personal knowledge of the matters asserted. Their statements are limited to hearsay that has no probative value. See ECF No. 3 at 119-123 (Declaration of Daniel Nettles); id. at 125-129 (Declaration of Randi Colvin).[10]

For these reasons, the presumption of correctness is not rebutted as to the superior court's finding that there was no juror misconduct. For the same reasons, the decision of the California Supreme Court was not based on an objectively unreasonable determination of facts in light of the evidence before that court. See 28 U.S.C. § 2254(d)(2). In sum, neither the decision of the California Supreme Court nor the decision of the superior court involved an unreasonable application of federal law or was based on an unreasonable determination of the facts in light of

////

---

[10] To the extent that petitioner wishes to further rebut the presumption of correctness in this court with new testimony from Ms. Lewis, ECF No. 35 at 2, additional evidence may not be presented in federal habeas unless there is first a determination that the state court unreasonably found the facts based on the evidence presented to it. Pinholster, 563 U.S. at 180-181. That standard is not met in this case.

the evidence presented in the state court proceeding. Federal habeas relief is therefore unavailable.

## II. Claim Two: Prosecutorial Misconduct

### A. Petitioner's Allegations and Pertinent State Court Record

Petitioner alleges that his due process rights were violated by three instances of prosecutorial misconduct in the course of state habeas proceedings. ECF No. 3 at 60-62. First, petitioner alleges that the prosecutor held an untranscribed, closed-door hearing on juror misconduct in petitioner's absence. Id. at 61. This allegation is based on the following record. During the course of postconviction investigation into the juror misconduct issue, Mr. Courtemanche (the victim's father) had told a D.A.'s investigator that Juror Number 7 had pulled alongside him on the freeway, stared at him, and attempted to take his picture. Petitioner's habeas counsel was provided a copy of the interview report. Mr. Courtemanche "advised that 'the court had another closed hearing about it…'" On the basis of that statement, habeas counsel sought preparation of a transcript of the referenced proceeding and augmentation of the record. Id. at 66-68 (motion); 71 (investigator's report).

Second, petitioner alleges that the prosecutor intimidated Jerilyn Lewis by accusing her of witness tampering when she was the one who had been approached by Juror Number 7 and not the other way around. This intimidation resulted in Ms. Lewis refusing to testify and her declaration was ruled inadmissible, prejudicing petitioner. Petitioner alleges that Ms. Lewis was not initially offered immunity, and only took the Fifth after she had been arrested and was appointed a lawyer. Id. at 61.

Third, petitioner alleges that the prosecutor's investigators harassed, threatened and intimidated Jerilyn Lewis. Id. at 62. In a declaration dated April 4, 2016, Daniel Nettles avers that Lewis told him that after she submitted her 2012 declaration about juror misconduct she was regularly harassed by the police in Fairfield. She was also harassed when she visited petitioner in jail, and told Nettles that on one occasion "someone from the DA confronted her at the jail and told her she would go to jail too if she kept going to see [petitioner]." The "last straw was when the police got Jerilyn evicted." Nettles believed what Lewis told him because of his own

experiences of racism and misconduct by Fairfield police. ECF No. 3 at 119-123. Petitioner also refers to a declaration from Adeline Cielo. Id. at 62. No declaration from Cielo is attached, but a June 2016 declaration from former counsel represents that Cielo told her that Lewis told him that she was being harassed. Id. at 125-129. Cielo also said that Lewis told him her original declaration about juror misconduct had been true, and that she had not spoken to the victim's family during the course of state habeas proceedings, admitted lying, or prayed with them. Id. at 127-128.[11]

### B. Federal Habeas Review is Unavailable for Errors in State Postconviction Proceedings

Respondent has answered on the merits, contending that the state court reasonably denied petitioner's prosecutorial misconduct claim. ECF No. 29-1 at 17-21. However, this court lacks jurisdiction to consider the issue. Federal habeas review under 28 U.S.C. § 2254(a) is generally limited to the constitutionality of the underlying criminal conviction on which custody is based; it does not extend to alleged violation of due process or other constitutional rights in state postconviction proceedings. See Franzen v. Brinkman, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam) (holding that "a petition alleging errors in the state post-conviction review process is not addressable through [federal] habeas corpus proceedings"); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997) ("errors concerning [state postconviction] process are not cognizable in federal habeas proceedings"), cert. denied, 525 U.S. 903 (1998); see also Villafuerte v. Stewart, 111 F.3d 616, 632 n.7 (9th Cir. 1997) (petitioner's claim that "he was denied due process in his state habeas corpus proceedings" was "not addressable in a section 2254 proceeding.")

In Cooper v. Neven, the Ninth Circuit applied these principles to find non-cognizable a petitioner's claims that his due process rights were violated by the state habeas court's failure to review certain evidence in camera and by the State's destruction or loss of the prosecutor's notes. 641 F.3d 322, 331-332 (9th Cir. 2011). In Ortiz v. Stewart, the Ninth Circuit held that a claim of

---

[11] These exhibits were submitted to the California Supreme Court. ECF No. 29-17 (post-evidentiary hearing petition to California Supreme Court) at 85-93 (declaration of counsel); id. at 266-270 (Nettles Declaration).

bias by a postconviction relief judge was not cognizable. 149 F.3d 923, 939 (9th Cir. 1998). Here, petitioner's claim that the prosecutor violated his due process rights by intimidating a habeas witness is non-cognizable for the same reasons as the claims in Cooper and Ortiz. The same is true of the allegations regarding a supposed secret hearing. Alleged misconduct related to state habeas proceedings simply does not provide a free-standing claim for relief in federal habeas. Claim Two should be denied on that basis.

## CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's juror misconduct claim was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d), and his prosecutorial misconduct claim is not cognizable in federal habeas. Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. See 28 U.S.C. § 2253(c)(2). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: April 25, 2024

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE